UNITED STATES of America,
Plaintiff-Appellee,

v.

IMPERIAL IRRIGATION DISTRICT, a corporation, Defendant-Appellee,

John M. Bryant et al.,
Defendants-Appellees,

State of California, Defendant-Appellee,

Ben Yellen et al., Appellants.

Ben YELLEN et al., Plaintiffs-Appellees,

v.

Cecil D. ANDRUS* et al.,
Defendants-Appellants.

Ben YELLEN et al., Plaintiffs-Appellees,

v.

Cecil D. ANDRUS * et al.,
Defendants-Appellants,

W. L. Jacobs et al.,
Defendants-Appellants.

Nos. 71-2124, 73-1333, 73-1388.

United States Court of Appeals,
Ninth Circuit.

Aug. 18, 1977.

* Walter J. Hickel, as Secretary of the Interior, was the originally named defendant. We substitute the name of his present successor in office. F.R.App.P. 43(c).

512

, Arthur Brunwasser, San Francisco, Cal., argued, for appellants.

Charles W. Bender, O'Melveny & Myers, Los Angeles, Cal., argued, for Landowners.

Reginald L. Knox, Jr., Horton, Knox, Carter & Rutherford, El Centro, Cal., argued, for Imperial.

Douglas B. Noble, Deputy Atty. Gen., Los Angeles, Cal., argued, for State of California.

Walter Kiechel, Jr., Asst. Atty. Gen., Lands Div., U. S. Dept. of Justice, Washington, D. C., argued for Secretary of Interior.

Before BROWNING and KOELSCH, Circuit Judges, and WOLLENBERG,** District Judge.

WOLLENBERG, District Judge:

The Imperial Valley in southern California is a highly productive agricultural area. This is due to an extensive irrigation system which distributes water obtained from the Colorado River, for without this irrigation water the Imperial Valley would be an unproductive desert. At issue in these cases is whether certain restrictions in the reclamation laws limit the delivery of irrigation water to resident landowners and whether water deliveries are limited to only 160 acres of the property held by each private landowner.

I. Historical Overview.

Because it is almost entirely below sea level, it was recognized as early as the middle of the nineteenth century that irrigation of the Imperial Valley with water diverted from the Colorado River was possible by gravity flow. A private corporation organized in 1896 as the California Development Corporation made the initial appropriations and diversions of Colorado River water. The water was taken from the River just north of the boundary between Mexico and the United States. However, in order to avoid high mesa and sandhill country north of the international boundary that separated the Colorado River from the Imperial Valley, the water was carried by canal for approximately 50 miles through

** The Honorable Albert C. Wollenberg, Senior United States District Judge for the Northern District of California, sitting by designation.

Mexico. After the canal re-entered the United States, the water was distributed to land in the Imperial Valley through a system of irrigation canals owned by seven mutual water companies. These water companies had been organized by the California Development Company and were later acquired by the individual landowners whose land received the water.

In 1905, the Colorado River broke through its banks with disastrous results. The River changed its course and for many months flowed through the washed-out intake of the California Development Company into the canal in Mexico and then into the Imperial Valley. The flood created the Salton Sea with a surface area of over 330,000 acres within the Imperial Valley and threatened to destroy the entire area. The California Development Company could not contain the River. Danger to the tracks of the Southern Pacific led that company to advance funds to the California Development Company to control the River, and the railroad took a controlling interest in the Development Company as security. The railroad eventually succeeded itself in closing the breach in the river bank and returned the River to its channel. In 1916, the railroad foreclosed on the Development Company's interests and then transferred those interests to the Imperial Irrigation District (hereinafter "District").[1]

At first, the District distributed water to the seven mutual water companies on a wholesale basis. By 1923, however, the District acquired all of the mutual water companies. Since then, it has been the only entity diverting, transporting, and supplying water from the Colorado River to agricultural lands in the Imperial Valley.

The interstate allocation of water from the Colorado River, control of flooding, regulation of water supplies on a predictable and useful basis, and the construction of a canal to the Imperial Valley that did not pass through Mexico were major concerns of not only Imperial Valley landowners but of the seven states in the Colorado Basin during the early years of the 1900s. Extensive efforts to resolve these problems led first to the agreement in 1922 between Arizona, California, Colorado, Nevada, New Mexico, Utah, and Wyoming known as the Colorado River Compact and then to the passage in 1928 of the Boulder Canyon Project Act (hereinafter "Project Act"). 45 Stat.1057, 43 U.S.C. §§ 617 *et seq.* The Project Act provided, *inter alia,* for ratification of the Colorado River Compact, the construction of Boulder (now, Hoover) Dam, and the construction of Imperial Dam where water was to be diverted to a canal running to the Imperial Valley. The canal was to run entirely through United States territory and hence received the name All-American Canal.

By the time the Project Act became effective in 1929, extensive private efforts had resulted in irrigation of almost 425,000 acres in the Imperial Valley. Since then, very little additional irrigated land has been added in the District. In 1932, the District entered into a contract with the United States providing for the construction of the Imperial Dam and the All-American Canal by the United States and repayment of certain costs by the District. Landowners in the Coachella Valley, north of the Imperial Valley, formed their own water district and eventually negotiated their own contract with the government for construction of facilities to deliver water to that Valley. Water delivery to the Imperial Valley through the All-American Canal began in 1940 and since 1942 the District's entire water supply has been carried through the All-American Canal. The District subsequently disposed of its interests in Mexico.

The 1932 contract with the District did not specifically provide for any acreage limitations on private lands receiving water through the massive projects being built by the United States. Due to the combination of a 1933 letter from the Secretary of the Interior to the District and the inaction of

---

1. The District, an agency of the State of California, was formed in 1911. See Cal.Water Code §§ 20500 *et seq.*

the Department of the Interior, no acreage limitations that were contained in the reclamation laws were enforced with respect to privately owned lands in the Imperial Valley. In 1964, the Solicitor of the Department of the Interior concluded that the previous Department interpretation of the law and administrative practice were incorrect and that the acreage limitations should apply to privately owned lands.

The Department of the Interior attempted to negotiate a new contract with the District that would incorporate acreage limitations but the negotiations failed. In 1967, therefore, the government filed an action for declaratory relief against the District. The complaint sought a declaratory judgment that the land limitation provisions of the reclamation law applied to privately owned lands in the District that received Colorado River water through the All-American Canal. The government specifically relied upon Section 46 of the Omnibus Adjustment Act of 1926, 44 Stats. 649, as amended, 43 U.S.C. § 423e (hereafter "Section 46"),[2] as the acreage limitation statute that applied.[3]

In its suit, the government did not rely upon Section 5 of the Reclamation Act of 1902, 32 Stat. 389, 43 U.S.C. § 431. That statute contains an earlier version of acreage limitations on lands receiving water

through federal reclamation projects. It also restricts the delivery of water through federal reclamation projects to lands owned by residents of the reclamation project area.[4] A group of Imperial Valley residents, dissatisfied with government nonenforcement of this statute in the Imperial Valley, brought suit in 1969 against the government to enforce the residency requirement of Section 5 of the Reclamation Act of 1902.

The government thus found itself in the position of claiming that, despite its previous inaction, one section of the reclamation law applied in the Imperial Valley while also defending its nonapplication of another section of the reclamation law which is in one respect similar to the statute it sought to apply. The cases were heard by two different judges and eventually the government's position was rejected in both cases. Before reaching the substantive matters raised in the appeals from these two decisions, we are obliged to consider procedural complications and questions of standing.

II. Standing.

A. *Yellen v. Andrus*, Nos. 73–1333, 73–1388.

This action (hereinafter "the residency case") was instituted by several individuals

---

2. In pertinent part, Section 46 provides that:
 No water shall be delivered upon the completion of any new project or new division of a project initiated after May 25, 1926, until a contract or contracts in form approved by the Secretary of the Interior shall have been made with an irrigation district or irrigation districts organized under State law providing for payment by the district or districts of the cost of constructing, operating, and maintaining the works during the time they are in control of the United States . . . and the execution of said contract or contracts shall have been confirmed by a decree of a court of competent jurisdiction. . . . Such contract or contracts with irrigation districts hereinbefore referred to shall further provide that all irrigable land held in private ownership by any one owner in excess of one hundred and sixty irrigable acres shall be appraised in a manner to be prescribed by the Secretary of the Interior and the sale prices thereof fixed by the Secretary on the basis of its actual bona fide value at the date of appraisal without reference to the pro-

posed construction of the irrigation works; and that no such excess lands so held shall receive water from any project or division if the owners thereof shall refuse to execute valid recordable contracts for the sale of such lands under terms and conditions satisfactory to the Secretary of the Interior and at prices not to exceed those fixed by the Secretary of the Interior. Because of California's community property laws, a husband and wife may own 320 acres and still be in compliance with the reclamation law. For the sake of consistency with the statutory language, the limitation referred to throughout this opinion will be 160 acres.

3. For a more detailed historical account, see *United States v. Imperial Irrigation District,* 322 F.Supp. 11, 12–15 (S.D.Cal.1971). Additional historical data will be referred to in the course of this opinion.

4. The precise scope of this restriction was hotly contested in the proceedings below.

who resided within the boundaries of the Imperial Irrigation District but who owned no farm land in the District or anywhere else in the United States. They sought to compel the Secretary of the Interior and various officials of the Department of the Interior to enforce the residency requirements of Section 5 of the Reclamation Act of 1902, 43 U.S.C. § 431.[5] Their case was brought in the form of a mandamus action under 28 U.S.C. § 1361.

In 1971, the district court granted partial summary judgment against the government, holding that 43 U.S.C. § 431 applies to private lands within the Imperial Irrigation District receiving water from the Boulder Canyon Project through the All-American Canal. *Yellen v. Hickel*, 335 F.Supp. 200 (S.D.Cal.1971). Thereafter, various landowners in the Imperial Valley intervened and raised arguments not previously set forth by the government. A full trial on the merits was then held. The district court issued findings of fact and conclusions of law and again held for the plaintiffs. *Yellen v. Hickel*, 352 F.Supp. 1300 (S.D.Cal. 1972). Judgment in favor of the plaintiffs was entered and both the government and the intervening landowners appealed.[6]

■ The issue of plaintiffs' standing to bring this action was considered at various times in the district court proceedings and was resolved in favor of the plaintiffs. See 352 F.Supp. at 1303–1304. In light of more recent Supreme Court decisions, this Court has not adopted the test for standing used by the district court in this case. *Bowker v.*

*Morton*, 541 F.2d 1347, 1349 n.3 (9th Cir. 1976). At this Court's invitation, the parties have submitted additional briefs on the standing question in light of the *Bowker* decision.[7]

■ In *Bowker v. Morton*, a group of small family farmers in one area of California sought to compel the government to apply the federal reclamation laws, particularly the residency requirement of 43 U.S.C. § 431 and the statutes concerning excess land holdings, to an irrigation project in another area of California. Although injunctive relief against other landowners was sought, the most the *Bowker* plaintiffs could have obtained was an order requiring the government to enforce the reclamation laws and discontinue supplying water to lands not in compliance with the law. That is essentially the relief sought by the plaintiffs in this case, and the standing test enunciated in *Bowker* applies in this case as well. Distilled from the recent cases of *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), and *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), that test, "compactly put, . . . is that the plaintiffs must have alleged (a) a particularized injury (b) concretely and demonstrably resulting from defendants' action (c) which injury will be redressed by the remedy sought." 541 F.2d at 1349. Application of that test to the facts of this case leads to the conclusion that the plaintiffs have no standing to maintain this action.

---

5. In referring to the sale of rights to the use of water delivered through federal reclamation projects to private landowners, 43 U.S.C. § 431 provides, in pertinent part, that "no such sale shall be made to any landowner unless he be an actual bona fide resident on such land, or occupant thereof residing in the neighborhood of said land." Act of June 17, 1902, c. 1093 § 5, 32 Stat. 389. Section 5 also contains limitations on the size of tracts for which rights to the use of water may be sold and conditions the permanent attachment of such rights on full payment by the landowner. The complaint did

not seek enforcement of these portions of Section 5.

6. The government's appeal is No. 73–1333, and the appeal of intervening landowners is No. 73–1388.

7. While the standing issue was raised below, at one time during the course of this appeal it may not have been pressed by the appellants. However, "since jurisdiction to decide the case is implicated," the issue must be considered. *Village of Arlington Heights v. Metropolitan*

In their amended complaint,[8] the plaintiffs alleged that they resided within the boundaries of the Imperial Irrigation District and in the vicinity of privately owned lands which are irrigated by water supplied through the federal reclamation project. They alleged that the only source of irrigation water in the Imperial Valley is the federal project. Much of the irrigated farm land in the area was alleged to be owned by persons who were not bona fide residents on the land and who were not residing in the neighborhood of the land. None of the plaintiffs owned any farm land and they alleged a desire to own farm land in the area. Because of the scant rainfall and lack of any other irrigation source, the plaintiffs would have to purchase lands irrigated with water from the federal reclamation project in order to fulfill their desire to own farm land. The essence of their case is that their ownership desires have been blocked because the government, by failing to enforce the residency provision of 43 U.S.C. § 431, permits irrigation water to be received by nonresident owners of farm land and that enforcement of the law will result in making farm land available for purchase at prices plaintiffs could afford. The district judge found that about half of the farms in the Imperial Irrigation District were owned by nonresidents and that enforcement of the residency requirement would bring "an immediate and substantial decline in the market value of farm land" in the District. He made no findings concerning the proportion of the farm acreage in the District owned by nonresidents or what his term "substantial decline" meant in terms of actual prices for farm acreage.[9]

■ In *Bowker*, the plaintiffs had not alleged that they desired to buy land in the area which they sought to bring under the provisions of the federal reclamation laws, and they did not state any prices which they could afford to pay should land be available for purchase. Consequently, their claim that failure to enforce the federal reclamation laws resulted in the unavailability of land for purchase at "reasonable" prices was held to fail to set out "a particularized injury resulting from the defendants' action." 541 F.2d at 1350. Here, plaintiffs do allege a desire to purchase farm land. However, there is nothing in the record to indicate what price any plaintiff could afford to pay for any particular farm or that enforcement of the residency requirement of 43 U.S.C. § 431 will lead to a decline in farm land prices sufficient to bring those prices into a range where plaintiffs could afford to purchase a particular farm.[10]

■ The relief sought by the plaintiffs in this case would not come through the government action they seek. The price of land is determined by the relationship between the demand for and supply of land in the Imperial Valley. The land market would adjust to a new residency requirement but at levels that cannot be determined with any degree of precision and which may still be higher than plaintiffs can afford. It is indisputable that a wide variety of other government actions can also affect this land market. A change in tax regulations relating to agricultural land or a change in the crop support system for crops grown in the Imperial Valley could just as likely affect the price of agricultural land as an application of the residency requirement. In addition, plaintiffs' inability to afford farming land also stems from their insufficient income. A change in

Housing Development Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

8. The record on this appeal does not include a copy of the amended complaint. However, the amended complaint does appear in the record of the companion appeal, No. 71–2124, in the Clerk's Transcript, Volume I, at pages 206–211.

9. Findings of Fact XXIX, XXX. 352 F.Supp. at 1317.

10. Plaintiffs cannot assert injury in their status as taxpayers. *Bowker v. Morton, supra*, 541 F.2d at 1349 n.2. In addition, they cannot claim injury from any failure of the government to discharge its duty to the public. *Turner v. Kings River Conservation District*, 360 F.2d 184, 198 (9th Cir. 1966).

government regulations concerning loans for the purchase of agricultural lands or income support to agricultural workers could increase the plaintiffs' ability to purchase farming land without necessarily reducing the price of land. The injury plaintiffs allege—the inability to purchase farming land at prices they can afford—is neither particularized nor does it flow "concretely and demonstrably" from the government's activities, or lack of activity, challenged in the complaint.

Furthermore, any relief that could appropriately be ordered in this case would not redress plaintiffs' alleged injuries. The most that could be ordered is a discontinuance of deliveries of water to lands owned by nonresidents. Nonresident landowners could not be forced to sell their lands. Some lands owned by nonresidents might be turned to industrial or residential uses. Nonresidents could move back to the area and continue to receive irrigation water for their lands.[11] Land placed for sale by nonresidents could be purchased by residents other than the plaintiffs or by nonresidents who wished to move to the area in order to obtain farm land. These two groups of prospective purchasers would compete with plaintiffs for the purchase of available farm lands and drive up prices. Plaintiffs were not required to prove with absolute certainty that this aspect of the test for standing would be satisfied, but after a full trial we are still of the opinion that:

[i]t is a mere speculative possibility that any relief which is appropriate under the statute will bring about the result sought by plaintiffs. . . . [T]he solution to plaintiffs' problem depends upon decisions and actions by third parties who are not before the court and who could not properly be the subject of a decree directing the result sought by plaintiffs.

*Bowker v. Morton, supra,* 541 F.2d at 1350.[12]

The conclusion that plaintiffs lack standing is not changed, as plaintiffs would suggest, by the decision of *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). The individual plaintiff in that case alleged more than a desire to live in a certain municipality. Instead, he sought to live in a particular proposed housing development, and he would have qualified to live there had the development been built. The builder of the proposed project was a co-plaintiff, and the challenged action of the municipal government was a direct roadblock to the fulfillment of the desires of both plaintiffs. There was no generalized grievance where redress depended on speculation about the activities of third persons not parties in the lawsuit. 429 U.S. at 260–264, 97 S.Ct. 555. The plaintiffs herein, on the other hand, are like the individual plaintiffs who were found to lack standing

11. The government has contended that residency is not a continuing requirement for the delivery of water. See, e. g., 43 C.F.R. § 230.65. In that case, those nonresidents who were residents when they first began to receive water might be able to continue to receive that water even if the residency requirement of Section 5 was enforced. This would add a further factor of uncertainty when considering whether plaintiffs' injuries would be redressed by the order they seek. However, the district court rejected this interpretation of Section 5. Consequently, without expressing any opinion on the correct view of the problem, we do not consider the possibility that residents could continue to receive water for their lands even after they move out of the area when evaluating the standing problem.

12. This is not a case where remand to the district court for the purpose of making further

relevant findings of fact would be appropriate. No individual plaintiff testified at the trial, and there is no other evidence which would support any findings on the desires of any individual plaintiff to purchase any particular farm. In addition, the testimony of the agricultural economist that forms the basis for the district court's finding that enforcement of the residency requirement would bring an "immediate and substantial" decline in land prices cannot support any findings more definite than the one the district court has already made. In fact, that testimony sets forth so many variables that must be considered in conjunction with a theoretical enforcement of the residency requirement that it supports, rather than detracts from, the conclusion that plaintiffs' injuries would not be redressed by the relief requested in this lawsuit. See Reporter's Transcript, pps. 254–277.

in *Warth v. Seldin, supra,* 422 U.S. at 502–508, 95 S.Ct. 2197.[13]

B. *United States v. Imperial Irrigation District,* No. 71–2124.

This appeal (hereinafter the "acreage case") comes to us in a different procedural posture from the residency case. Here, the complaint was filed by the government. It sought a declaration that the excess land provisions of the reclamation laws, particularly Section 46 of the Omnibus Adjustment Act of 1926, applied to privately owned lands in the Imperial Irrigation District that received irrigation water through the All-American Canal. There was no question of the government's standing. This case was not heard by the same judge who made the decisions in the residency case. In an opinion reported at 322 F.Supp. 11 (S.D.Cal.1971), the district court ruled against the government. Judgment was entered, and the government decided not to appeal.

After judgment had been entered and before the time for filing a notice of appeal had run out, a group substantially identical to the plaintiffs in the residency case filed a protective notice of appeal and sought leave to intervene.[14] The district court denied permission to intervene. On appeal, another panel of this Court reversed the district court's order denying permission to intervene, allowed intervention, and validated the protective notice of appeal. That panel

further ordered that the appeal in this case be consolidated with the appeals in the residency case.

The unpublished order allowing intervention is attached as an appendix to this opinion. The order emphasized the two conflicting decisions from the district court concerning applicability of the reclamation laws and the responsibility of the court to resolve this problem if such a resolution were "feasible". Of course, that the panel did not have the residency appeal before it and could not anticipate our decision on standing in light of cases, such as *Bowker v. Morton, supra,* which had not been decided when intervention was allowed. Since the district court decision in the residency case must be vacated because of lack of standing on the part of the plaintiffs therein, the basis for the order allowing intervention in the acreage case has disappeared.[15]

The Yellen intervenors urge that the order allowing intervention cannot be re-examined because of the "law of the case" doctrine. That doctrine, however, is not to be applied woodenly. An appellate court has the power to reconsider issues that have been previously decided and will do so if such a course is warranted by "considerations of substantial justice." *Lehrman v. Gulf Oil Corporation,* 500 F.2d 659, 662–663 (5th Cir. 1974), *cert. denied,* 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975). This case does not involve a previ-

---

13. There is a second, nonconstitutional standing requirement that the interests of the plaintiffs be "arguably within the zone of interests to be protected or regulated" by the statute which plaintiffs seek to enforce. *Data Processing Serv. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1969), cited in *Simon v. Eastern Kentucky Welfare Rights Organization, supra,* 426 U.S. at 39 n.19, 96 S.Ct. 1917, 48 L.Ed.2d 450. Determination of this question would also be relevant to the determination of whether the government has a "duty" to plaintiffs which can be enforced by an action in the nature of mandamus under 28 U.S.C. § 1361. In view of our disposition of this case, there is no need to consider these questions as they arise in the context of this case.

14. This group had previously been given permission to appear below as *amicus curiae.*

15. The order allowing intervention also appears to be based on a misunderstanding as to the identity of the various intervenors. The district court allowed various interested Imperial Valley landowners to intervene as defendants early in the proceedings. This Court's earlier order allowing intervention refers to the "interested Imperial Valley landowners" as the group seeking to perfect and prosecute the appeal. In fact, this group had obtained a favorable decision from the district court and opposed the prosecution of an appeal by parties other than the government. It was the Yellen group, a group of non-landowners, who had filed the protective notice of appeal and who sought to prosecute the appeal, and whose intervention request had been denied by the district court.

ous remand to the district court or "panel shopping" by any of the parties. It involves an unpublished interlocutory order allowing an appeal to go forward where the basis of the order has been eliminated by subsequent events.[16] It would be ironic to allow the Yellen intervenors to use an erroneous district court ruling on standing in another case to bootstrap themselves into a position of litigating the important question of the enforcement of the federal reclamation laws in this case. Under these circumstances, it is appropriate to once again examine the request for intervention.

A party seeking to intervene pursuant to Rule 24, Federal Rules of Civil Procedure, need not possess the standing necessary to initiate the lawsuit. *Trbovich v. United Mine Workers of America*, 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972). Nevertheless, a party possessing the standing to intervene does not automatically have the ability to appeal a decision which all other parties have decided not to appeal. In order to be able to appeal, the intervenor must have an "appealable interest." Shapiro, *Some Thoughts on Intervention Before Courts, Agencies and Arbitrators*, 81 Harvard Law Rev. 721, 753–754 (1968). Resolution of this question turns on traditional standing analysis. *Norman's on the Waterfront, Inc. v. Wheatley*, 444 F.2d 1011, 1013–1014 (3rd Cir. 1971). Mere interest in the establishment of a legal precedent is not sufficient. *Boston Tow Boat Co. v. United States*, 321 U.S. 632, 64 S.Ct. 776, 88 L.Ed. 975 (1944). With these considerations in mind, we turn to the question of whether the Yellen group had an interest in this litigation that would permit them to intervene for the purpose of taking an appeal from the judgment of the district court.

In support of their motion for permission to intervene, the Yellen group asserted that they resided within the boundaries of the Imperial Irrigation District, that most of them were farm workers, that none owned farm land anywhere in the United States, and that they desired to purchase "excess lands" irrigated with water delivered by the federal reclamation project. These excess lands would be the private lands that would have been sold under the provisions of Section 46 of the Omnibus Adjustment Act of 1926, 43 U.S.C. § 423e, had the government prevailed in the litigation. They further alleged that they were within the class of beneficiaries of the reclamation laws that were the focus of the lawsuit.[17] Read, as it must be, in the light of the government's complaint, their interest is in the purchase of farm lands at prices to be set in accord with the dictates of Section 46.

This Court has only recently extensively reviewed the purposes behind Section 46. That Section was adopted to achieve broad antimonopoly and antispeculation purposes "conceived by Congress to be of importance to society as a whole." *United States v. Tulare Lake Canal Co.*, 535 F.2d 1093, 1121 (9th Cir. 1976), *cert. denied*, 429 U.S. 1121, 97 S.Ct. 1156, 51 L.Ed.2d 571. We specifically noted also that "Section 46 was intended to accomplish the redistribution of large privately owned tracts at prices substantially below the actual value of such lands at the time of sale." *Id.* The history of the reclamation laws confirms that one of their primary purposes was the establishment of a large number of family-size farms. *Id.* at 1119, 1122. See generally, Taylor, *The Excess Land Law: Execu-*

---

16. Under Ninth Circuit Rule 21, the unpublished order allowing intervention is not regarded as precedent but is relevant to the law of the case. Whether it should stand as the law of the case is the very question we determine. The order itself required the appeal to be heard by this panel in conjunction with the appeal in the residency case and thus necessarily contemplated that this panel would dispose of both cases in the appropriate manner. Such a disposition includes a determination of the proper law of the case. Under these circumstances, there is no requirement that reconsideration of the order allowing intervention be done *en banc.* Cf. *Chabot v. National Securities and Research Corporation*, 290 F.2d 657, 659 (2d Cir. 1961).

17. They also alleged an interest because of their prosecution of the residency case. In light of our disposition in that action, we do not consider whether this is an interest that would support intervention.

*tion of a Public Policy*, 64 Yale L.J. 477, 481–489 (1961). In this case, the district court found that there were approximately 800 owners of irrigable land in the Imperial Irrigation District whose holdings totalled over 160 acres and that the aggregate land-holdings of this group were approximately 233,000 acres.[18] Sale of any of these holdings in excess of 160 acres in accord with Section 46 would make family-size farms available for purchase in the Imperial Valley at prices below current market prices.[19]

The injury that the Yellen group is asserting in this case is not merely the high cost of land. More precisely, they assert that in order to buy irrigable farm land in the Imperial Valley they must pay prices higher than they would have to pay if Section 46 applied to the private landowners in the area. The Yellen group suffers from this injury no matter which parcel of land is desired for purchase. The fact that it cannot be specifically measured in dollar amounts at this time does not change the fact that, under the formula established in *United States v. Tulare Lake Canal Co., supra,* the sale price of parcels of irrigable farm land in the Imperial Valley will definitely be reduced if Section 46 were to be applied as the United States originally contended when this action was filed.

This injury stems directly from the lack of recordable contracts required by Section 46. In the absence of a requirement that landowners execute such a contract in order to receive irrigation water, it is inconceivable that any landowner would sell any land at prices substantially below current market prices.

Furthermore, this injury would be redressed by a court order declaring the applicability of Section 46. There would be no need to bring additional parties before the district court before such an order could be issued. Once there was such a court order, redress of the injury would not depend upon the uncertain responses of the large landowners or the land market. While not all landholders might execute the contracts required by Section 46, the vast majority of the land in use in the Imperial Valley Irrigation District is engaged in agricultural production and it would be highly improbable that all of the large holdings of irrigable land would be withdrawn from agricultural use in order to avoid the requirements of Section 46. Once the appraisal process was completed, formerly large agricultural landholdings would be available in small parcels at prices below the current market price.

It is important to emphasize the difference between the interest and injury involved in this case and the situations in the residency case and the *Bowker* case where the plaintiffs were found to lack standing. In the residency case, the plaintiffs sought a court order that would not, except in a very speculative sense, lead to the availability of farm land at an undefinable price which the plaintiffs could allegedly afford. In contrast, the interest asserted here is much more limited. It is an interest only in reducing land prices, not an interest in reducing land prices to any specific level, and unlike the residency case it is an interest that can be satisfied by an appropriate court order and without the need to depend on the uncertain actions of non-parties to the action and the uncertain responses of the market for agricultural land. In the *Bowker* case, the plaintiffs sought only to force landowners in another area to sell their land at prices determined by the application of Section 46. They did not desire to purchase this land, even if the price were to be reduced, and those plaintiffs were therefore not injured by higher land prices. In contrast, the group attempting to intervene and prosecute the appeal herein desires to take advantage of a certain reduction in land prices and purchase land at those reduced prices.

 In its order denying the Yellen group leave to intervene, the district court

---

**18.** *United States v. Imperial Irrigation District, supra,* 322 F.Supp. at 12.

**19.** For a description of the method for determining the sale price, see *United States v. Tu-* *lare Lake Canal Co., supra,* 535 F.2d at 1113 n.74, 1144.

noted that the potential intervenors had not demonstrated a present ability to purchase the lands they desired. The district court also noted that the requirement for recordable contracts was not inconsistent with the usual right of a seller to choose his purchaser and that there would quite likely be a large group of people with veteran's preferences for the purchase of excess lands that would have a better chance than the Yellen group to purchase excess lands created by the enforcement of Section 46.[20] However, the standing test of Article III does not require that the Yellen group show with certainty that they will be able to purchase the excess lands should they prevail on the merits of this appeal. The Yellen group occupies a position similar to that of the developer in *Village of Arlington Heights v. Metropolitan Housing Development Corporation, supra.* The relief sought by the developer would not guarantee that its project would be built, for further problems with financing or construction, unrelated to the subject of the lawsuit, might interfere with its building plans. Such speculation, however, could not diminish from the fact that the relief sought was necessary if construction were to take place and that the developer had the requisite stake in the lawsuit. 45 U.S.L.W. at 4076. Similarly, in this case the likelihood that other factors

may interfere with the intervenors' desires to purchase land cannot change the fact that land will never be available at below current market prices unless Section 46 is held to be applicable and that the intervenors thus have the necessary stake in the outcome of the lawsuit to confer standing to prosecute this appeal.[21]

Finally, it must be determined whether the Yellen group has an interest sufficiently within the "zone of interests" protected by Section 46 which is different from the interest of a taxpayer or member of the general public and which satisfies the non-constitutional test for standing of *Data Processing Serv. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1969).[22] From our previous summary of the purposes behind Section 46, derived from *United States v. Tulare Lake Canal Co., supra,* it would appear that a non-landowning resident of an area where agriculture is feasible only because of a federal irrigation project who desires to purchase agricultural land and become a farmer is a particular "beneficiary" of Section 46 distinct from the general public and falls within the statute's "zone of interests."

The Yellen group thus has an interest under Rule 24(a)(2) which it may pursue on appeal.[23] Accordingly, we reaffirm the pre-

**20.** We express no opinion on the validity of these propositions.

**21.** See also *National Association of Neighborhood Health Centers, Inc. v. Mathews,* 179 U.S. App.D.C. 135, 551 F.2d 321 (D.C.Cir.1976). There, an organization of community mental health centers sought to appeal a district court order concerning the transfer of federal funds by certain states from outpatient aid programs to hospital aid programs. Return of the funds to the outpatient aid program would not have meant that the plaintiff organization's members in those states would then have received the funding grants under the outpatient aid program. However, return of the funds would have benefited these members because it would create a larger pool of funds available for outpatient programs. This enhancement of the prospect of funding was held to be "substantial relief" sufficient to establish standing to challenge the district court's order concerning the transfer of funds. *Id.* at 329. Similarly, in this case, the intervenors' opportunity to obtain significantly lower land prices would be substan-

tially enhanced by an appropriate court order. In the residency case, however, our previous discussion has pointed out that there is no substantial certainty that the opportunity of the plaintiffs therein for obtaining the relief sought in that case would be enhanced by an appropriate court order.

**22.** See footnotes 9 and 12, *supra.*

**23.** The district court discussed other reasons for denying intervention. First, it held that a previous proceeding in the California courts precluded the applicants for intervention from further litigating the acreage limitation question. We consider this problem in Section III, *infra.* The district court also decided that the Yellen group's interest was too speculative and remote to support intervention *because its decision on the merits would first have to be reversed on appeal.* However, that was the very result that the Yellen group sought. The district court also felt that the necessity for further proceedings to determine the value of

vious order granting intervention and validating the protective notice of appeal, and we proceed to consider the merits of the case.

### III. Res Judicata.

After the United States and the Imperial Irrigation District entered into the contract for the repayment of construction costs for the All-American Canal, the District initiated a confirmation action in the Superior Court of California for Imperial County. This action, entitled *Hewes v. All Persons*, resulted in a 1933 judgment that the landowners[24] claim is *res judicata* as to the contention that acreage limitations apply to privately owned lands in the Imperial Irrigation District.

In 1933, California law allowed an irrigation district to submit a contract for cooperation with the United States to a superior court for a validation proceeding.[25] Pursuant to Article 31 of its contract with the United States, the District was required to institute a judicial confirmation proceeding, and the *Hewes* action was designed to satisfy that requirement.[26] The validity of the contract was challenged on grounds not relevant here by landowners in the Coachella

Valley. At the same time, a landowner in the Imperial Valley named Charles Malan instituted another action entitled *Malan v. Imperial Irrigation District*. The *Malan* action raised a number of objections to the contract. One of those objections was that Malan, as an owner of more than 160 acres, would be deprived of delivery of water for his excess lands by the reclamation law if the contract was confirmed. The District took the position that this objection was meritless as the acreage limitation provisions did not apply under the terms of the Project Act. The District even went so far as to solicit a letter from the Secretary of the Interior to support their position in the *Malan* litigation.[27]

The *Malan* case was considered along with the *Hewes* confirmation proceeding. The superior court found that the contract would not limit the delivery of water to excess lands, concluded that no acreage limitations were made applicable to private lands by the contract and specifically stated that Section 5 of the Reclamation Act of 1902 did not apply in the Imperial Valley.[28] The judgment of the superior court became final in 1934 when appeals from that judg-

---

lands to be disposed and a plan for disposition made the possibility of relief even more remote. The length of time, however, before lands become available does not diminish the interest of the applicants for intervention. Finally, the district court noted that the United States had vigorously represented the interests of the Yellen group throughout the litigation. However, the decision of the government not to appeal meant that those interests were no longer being adequately represented.

**24.** Appellees in this case are the Imperial Irrigation District, named as a defendant below, landowners in the District owning more than 160 acres of irrigable land (appearing on behalf of themselves and the class of landowners owning excess lands) who were allowed to intervene by the district court, and the State of California which was also allowed to intervene below. Not all of the appellees have raised the same arguments in support of the judgment but none have taken positions that contradict the arguments of another appellee. The briefs of the landowner intervenors are the most comprehensive. Consequently, for the sake of convenience, all the appellees will be referred to

throughout the remainder of this opinion as landowners.

**25.** 1897 Cal.Stat. c. 189, p. 276 § 68; 1917 Cal.Stat. c. 160, p. 243 § 3. See Cal.Water Code §§ 22670–22671, 23225.

**26.** No such requirement was contained in the Project Act. The parties dispute whether the requirement was placed in the contract because of provisions for a confirmation proceeding in Section 46, Section 1 of the Act of May 15, 1922, 43 U.S.C. § 511, or merely because of California law. We deem it unnecessary to decide the source of authority for the contract provision for a judicial confirmation proceeding. The relevant issue is the *res judicata* effect to be given a judgment actually rendered by a California court in a confirmation proceeding.

**27.** See part VI of this opinion. .

**28.** Although partially denominated a finding of fact, it is clear that all of the essentials of the decision on the acreage limitation issue were legal conclusions.

ment to the California Supreme Court were dismissed by the parties.[29]

The United States was not a party in the *Hewes* and *Malan* actions, and the landowners did not raise a *res judicata* defense against the United States in the district court proceedings in the present case. The intervenors claim that such a defense cannot be raised against the United States and therefore cannot be raised against them because they are only asserting claims originally raised by the government. However, as discussed previously, the interests of an intervenor appealing a judgment are not necessarily identical with the interests of a non-appealing party which originally instituted the action. The intervenors' interests in this case are their own private interests and not the public interests represented by the government. Accordingly, we must determine whether the intervenors are barred by *res judicata* from litigating the acreage limitation question.

 Under California law, a confirmation proceeding involving an irrigation district contract with the United States is considered an *in rem* proceeding. It is brought against all persons claiming an interest in the formation of the irrigation district, the operation of the contract, and the lands affected by the contract. A final judgment in a confirmation proceeding "will foreclose further inquiry into the matters to which the judgment properly relates. Within its pertinent issues it will be binding on the world at large." *Ivanhoe Irrigation District v. All Parties & Persons,* 47 Cal.2d 597, 606, 306 P.2d 824, 829 (1957), *reversed on other grounds sub nom., Ivanhoe Irrigation District v. McCracken,* 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958). Phrased another way, "[w]ithin its legitimate issues it will be binding on the world at large."

*Santa Barbara County Water Agency v. All Persons & Parties,* 47 Cal.2d 699, 703, 306 P.3d 875, 878 (1957), *reversed on other grounds sub nom., Ivanhoe Irrigation District v. McCracken, supra.*

 It therefore becomes necessary to determine what the "pertinent" or "legitimate" issues are in a confirmation proceeding, because the California courts will recognize the confirmation proceeding judgment as *res judicata* only as to those issues to which the judgment "properly relates". This question was answered in the *Ivanhoe* proceedings in opinions of the California Supreme Court both before and after the Supreme Court decision on other aspects of the case. "The judgment [in a confirmation proceeding] is limited to a determination of the validity of the contract." *Ivanhoe Irrigation District v. All Parties and Persons, supra,* 47 Cal.2d at 607, 306 P.2d at 829, such a judgment determines questions necessarily incident to such a determination. *Id.* However, "the *only* issue involved is the validity of the contract." *Ivanhoe Irrigation District v. All Parties and Persons,* 53 Cal.2d 692, 699, 3 Cal.Rptr. 317, 320, 350 P.2d 69, 72 (1960) (Emphasis supplied.)

 For purposes of this case, therefore, we start with the proposition that the *Hewes* judgment establishes the validity of the contract. That portion of the *Hewes* decision dealing with the acreage limitations of the reclamation law, however, is not essential to a determination that the contract was valid. A decision that the Project Act incorporates the acreage limitations on private lands of the reclamation law into the contract would not make the contract invalid under federal law, *Ivanhoe Irrigation District v. McCracken,* 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958), or California law. *Ivanhoe Irrigation District*

---

**29.** While the appeal was pending, the Bureau of Reclamation sent a letter to the Coachella Valley water district to the effect that unless it dismissed its appeal, the Bureau would make plans for the All-American Canal that would not include a capacity to deliver water to the Coachella Valley. While the reasons for the dismissal of the Coachella appeal are not in the record, it should be noted that shortly thereaft-

er the Coachella appeal was in fact dismissed and a separate contract for the Coachella Valley was negotiated with the United States. The record also includes a letter from Malan's attorney complaining about pressure to drop the appeal, but the record does not contain anything to explain why Malan's appeal was dismissed.

v. *All Parties and Persons,* 53 Cal.2d 692, 3 Cal.Rptr. 317, 350 P.2d 69 (1960).[30] A decision that the Project Act does not incorporate the acreage limitations is a decision that Congress exempted the project from application of those limitations and would not make the contract invalid under federal or California law. The decision that acreage limitations did not apply under the contract was therefore irrelevant to the only question properly before the court in the confirmation proceeding—the validity of the contract—and it is pure dicta. Cf. *Stanson v. Mott,* 17 Cal.3d 206, 212, 130 Cal.Rptr. 697, 701, 551 P.2d 1 (1976).

The federal courts are bound to give the *Hewes* judgment the "same full faith and credit" it would be given by the courts of California. *Neale v. Goldberg,* 525 F.2d 332 (9th Cir. 1975). The determination of the *Hewes* court that acreage limitations did not apply in the Imperial Irrigation District was not a determination which is "properly related" to the purpose of the confirmation proceeding because decision of that issue one way or another cannot affect the validity of the contract under federal or California law. The determination of the acreage limitation issue by the *Hewes* court was an interpretation of the terms of the contract that the court was not entitled to make in a confirmation proceeding. Cf. *Ivanhoe Irrigation District v. All Parties and Persons, supra,* 53 Cal.2d at 727–728, 3 Cal.Rptr. at 338, 350 P.2d at 90. While the acreage limitation was litigated in the confirmation proceeding, that issue was incidental and collateral to the judgment rendered therein. The judgment in the confirmation proceeding cannot foreclose consideration of the acreage limitation issue in the present case. *Memorex Corp. v. International Business*

*Machines Corp.,* 555 F.2d 1379, 1898 (9th Cir. 1977).[31]

IV. Statutory Construction.

The enactment of the Boulder Canyon Project Act was not due solely to the problems of the Imperial Valley. A canal to the Valley running entirely within the United States had been desired for many years, and the District, unable to construct the necessary facilities with its own resources, had turned to Congress for assistance. In addition, however, the Project Act was the outgrowth of extensive concerns of the seven Colorado River Basin states over allocation of river water on an equitable basis, the control of flooding, and the more productive use of the water. Moreover, international considerations were involved because of Mexico's interest in the Colorado River. The history of the Project Act summarized in *Arizona v. California,* 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963), need not be repeated here. See also *Arizona Power Authority v. Morton,* 549 F.2d 1231, 1233–1234 (9th Cir. 1977). For present purposes, it is sufficient to say that Congress recognized that the problems could not be handled on a local or even state-by-state basis, and that the matter had become a pressing national concern.

At the same time as the concerns and proposals culminating in the passage of the Project Act had been occupying the attention of Congress, various revisions of the general reclamation laws, culminating in Section 46 of the Omnibus Adjustment Act of 1926, had been enacted into law. Section 12 of the Project Act defined the term "reclamation law" to include the Reclamation Act of 1902 "and the Acts amendatory thereof and supplemental thereto," 43

---

**30.** While this case interpreted Cal. Water Code §§ 23197, 23200, which were enacted in 1943, those statutes are essentially the same as earlier California statutes to the same effect that were applicable when the Imperial Irrigation District contract was made. See 1917 Cal.Stat. c. 160, pps. 244, 245, §§ 2, 4.

**31.** We therefore need not determine whether intervenors were interested parties in the *Hewes* litigation such that they were bound by

the determination of the acreage limitation issue when neither of the parties litigating that issue wished to see the acreage limitations apply in the Imperial Valley, *Aerojet-General Corporation v. Askew,* 511 F.2d 710, 720–721 (5th Cir. 1975), *reh. den.,* 514 F.2d 1072 (1975), or whether important policy considerations mandate the inapplicability of *res judicata* principles in litigation of the acreage limitation question.

U.S.C. § 617k, and Section 46 would be included in that definition. Section 14 of the Project Act stated that the Act was a "supplement" to the reclamation law. 43 U.S.C. § 617m. By the operation of Sections 12 and 14, the Project Act was incorporated into the framework of the reclamation laws, including Section 46, that had recently been considered by Congress and that had also been the subject of national concern for some time.

Section 1 of the Project Act, 43 U.S.C. § 617, authorizes construction of "a main canal and appurtenant structures located entirely within the United States" to deliver water from the Colorado River to the Imperial and Coachella Valleys. While providing that there be no charge for the water or the "use, storage, or delivery" of the water, Section 1 requires that expenditures by the United States for the "main canal and appurtenant structures" be reimbursable "as provided in the reclamation law." Section 4(b) of the Project Act, 43 U.S.C. § 617c(b), mandates that reimbursement be secured by the Secretary of the Interior:

> by contract or otherwise, adequate in his judgment to insure payment of all expenses of construction, operation and maintenance of said main canal and appurtenant structures in the manner provided in the reclamation law.

Section 14 of the Project Act reinforces the command of Section 4(b) by providing that the "reclamation law shall govern the construction, operation, and management of the works herein authorized, except as otherwise herein provided." 43 U.S.C. § 617m. The Project Act thus explicitly calls for the reclamation law to govern contracts for payment to the United States for the "construction, operation, and maintenance" of the All-American Canal.

■ The Project Act was approved December 21, 1928, and it became effective on June 25, 1929. At that time, the portion of the reclamation law governing contracts for payment of the costs of "constructing, operating, and maintaining" works on new reclamation projects was Section 46. Section 46 requires that such contracts provide that private lands in excess of 160 acres should not receive water from the reclamation project unless the owners agree to sell their excess lands according to the scheme set out in Section 46. By direct scrutiny of the statutory language, it is apparent that the acreage limitations of Section 46 apply to private lands in the Imperial Irrigation District that receive irrigation water from the All-American Canal.

The excess land provisions are an important cornerstone of the reclamation laws.[32] Congress has exempted some projects from the operation of these provisions, but "the Congress has always made such exemption by express enactment." *Ivanhoe Irrigation District v. McCracken,* 357 U.S. 275, 292, 78 S.Ct. 1174, 1184, 2 L.Ed.2d 1313 (1958).[33] In the face of language directly mandating application of the excess lands provision of Section 46 to private lands in the Imperial Irrigation District, and in the absence of any language in the Project Act that is comparable to the example of a specific exemption used by the Supreme Court in the *Ivanhoe* case, the landowners nevertheless argue that various portions of the Project Act necessarily operate to create such an exemption. It is to these contentions that we now turn.

■ Under the Boulder Canyon Project Act, the Secretary of Interior has broad powers to allocate the waters of the Colorado River among the "Lower Basin" states of California, Nevada, and Arizona, and to determine which users within these states will receive water. The Secretary's authority to carry out these allocations is exer-

---

**32.** One treatise has commented that "[a]creage limitation is, in every respect, the most important part of reclamation law." 2 *Waters and Water Rights,* § 120 at p. 209 (1967).

**33.** Although referring to Section 5 of the Reclamation Act of 1902, this statement applies equally well to the excess land provision of Section 46 of the Omnibus Adjustment Act of 1926. The very example of a specific exemption used by the Supreme Court in fact referred specifically only to Section 46. See 68 Stat. 1190.

cised through contracts made pursuant to Section 5 of the Project Act, 43 U.S.C. § 617d. *Arizona v. California, supra,* 373 U.S. at 580, 83 S.Ct. at 1487. One of the most significant limitations on this allocation power is that the Secretary is "required" by Section 6 of the Project Act to satisfy "present perfected rights in pursuance of Article VIII of said Colorado River Compact." *Id.* at 584, 83 S.Ct. at 1489; 43 U.S.C. § 617e. Article VIII of the Colorado River Compact provides that "[p]resent perfected rights to the beneficial use of water of the Colorado River System are unimpaired by this Compact."[34] The term "present perfected rights" from the Colorado River Compact is thus incorporated into and made applicable to allocation of water under the Project Act. *Arizona v. California, supra,* 373 U.S. at 566, 83 S.Ct. at 1468.[35]

The Secretary's contractual powers under Section 5 of the Project Act are also limited by Section 14 of that Act which provides that "[t]his subchapter shall be deemed a supplement to the reclamation law, which said reclamation law shall govern the construction, operation, and management of the works herein authorized, except as otherwise herein provided." 43 U.S.C. § 617m. It is the landowners' position that the qualifying clause of Section 14, "except as otherwise herein provided", subordinates Section 14 to other specific provisions in the Project

Act that conflict with the reclamation laws. They further contend that Section 6 of the Act, in providing for the satisfaction of present perfected rights, necessarily conflicts with the application of excess land provisions of Section 46 and renders the latter provisions inapplicable in the Imperial Irrigation District.[36]

■ A "present perfected right" is a "water right acquired in accordance with state law, which right has been exercised by the actual diversion of a specific quantity of water that has been applied to a defined area of land or to definite municipal or industrial works" as of June 25, 1929, the effective date of the Project Act. *Arizona v. California,* 376 U.S. 340, 341, 84 S.Ct. 755, 756, 11 L.Ed.2d 757 (1964).[37] In the case of the Imperial Valley, it therefore becomes necessary to determine the nature of the ownership of water rights under California law.[38] Examination of California law on this point leads to the conclusion that the landowners' argument must be rejected and that satisfaction of present perfected rights is not incompatible with the application of the excess lands provision of Section 46.

■ No individual landowner in the Imperial Valley has filed a claim to water from the Colorado River under the terms of the Supreme Court's decree in *Arizona v.*

**34.** Section VIII of the Colorado River Compact also provides that the rights attached when storage of water reached a certain level. The text of the Compact can be found at 70 Cong. Rec. 324 (1928).

**35.** The landowners also claim that Sections 8 and 13(c) of the Project Act make the Colorado River Compact applicable to the Act. However, the references to the Colorado River Compact in Sections 8 and 13(c) were used only to show that the Project Act did not change the Compact's division of water between the Upper and Lower Basins. *Arizona v. California, supra,* 373 U.S. at 566, 83 S.Ct. at 1480.

**36.** This argument overlooks the possibility that the Secretary may determine to allocate to the Imperial Irrigation District more water than the amount ultimately determined to be the District's present perfected rights. Water in excess of the District's present perfected rights would not be the subject of Section 6 of the

Project Act and would not be protected by that Section from the operation of Section 46.

**37.** As is clear from the discussion of Section 8 of the Reclamation Act of 1902, 43 U.S.C. § 383, and Section 18 of the Project Act in *Arizona v. California, supra,* 373 U.S. at 586–587, 83 S.Ct. 1468, not all rights to water under state law control the Secretary's decisions. "Present perfected rights" are thus not the equivalent of all forms of vested rights under state law.

**38.** It had been stipulated below by the government that the Imperial Irrigation District possessed present perfected rights, and we see no reason at this point to disturb this stipulation. While the exact quantity of these present perfected rights has not yet been determined, such an exact accounting is not necessary to this argument of the landowners. But, see footnote 36, *supra.*

*California, supra,* 376 U.S. at 351–352, 83 S.Ct. 1468, and there are no records of individual claims by Imperial Valley landowners for water rights as of June 25, 1929. Under California law, the Imperial Irrigation District holds legal title to the rights to Colorado River water in trust for the landowners. *Merchants National Bank of San Diego v. Escondido Irrigation District,* 144 Cal. 329, 334, 77 P. 937, 939 (1904).[39] The water rights themselves are not held in trust for any individual landowner. The equitable ownership of the water rights is held in common by all the landowners in the District, *Id.* These principles of ownership have been specifically applied to the Imperial Irrigation District. *Hall v. Superior Court,* 198 Cal. 373, 383, 245 P. 814, 818 (1926).

 The concept of an irrigation district's ownership of water rights in trust for the common benefit of landowners within the district is derived from the California doctrine that the use of appropriated water is a public use. Thus, the users of water, the rights to which are held by an irrigation district in trust for the common benefit, do not possess rights to the water that can be considered private property in the ordinary sense of the words, nor do the lands irrigated by that water thereby obtain any absolute right to the continued delivery of water. Landowners within an irrigation district do not possess as part of their freehold estates a proportionate ownership in the water rights owned by the irrigation district. The right of any individual landowner to the use of water, which must be a public use, comes about by reason of the landowner's status as a member of the class for whose benefit the water has been appropriated. *Madera Irrigation District v. All Persons,* 47 Cal.2d 681, 691–693, 306 P.2d 886, 892–893 (1957), *reversed on other grounds sub nom., Ivanhoe Irrigation District v. McCracken, supra; Jenison v. Redfield,* 149 Cal. 500, 87 P. 62 (1906).

 A consequence of this rule is that no particular landowner or particular piece of land is entitled to use any particular proportion of the water to which the irrigation district owns rights. As new landowners and as new lands come within the jurisdiction of the irrigation district, they are entitled to use their proper share of the water, and the shares of all landowners would have to be redistributed. *Madera Irrigation District v. All Persons, supra,* 47 Cal.2d at 692, 306 P.2d at 893.

 It follows that all the present perfected rights owned by the Imperial Irrigation District as of June 25, 1929, are not water rights owned by any particular landowner. Satisfaction of the Imperial Irrigation District's present perfected rights by the Secretary of the Interior in the allocation of Colorado River water therefore only concerns the total quantity of water to be supplied to the Imperial Irrigation District and does not concern supplying any particular amount of water due to any particular landowner. The excess land provisions of Section 46, however, apply only to individual landowners and do not, under the Project Act, apply to the Imperial Irrigation District as the owner of water rights in trust for the common benefit. Excess lands of a particular landowner could be deprived of water without reducing the total amount of water delivered to the Imperial Irrigation District. The District would have to redistribute its deliveries if certain lands became ineligible for delivery of water, but the satisfaction of the District's total present perfected rights would not be impaired by the operation of Section 46. Furthermore, redistribution of deliveries in accord with the excess lands provisions of Section 46 would not violate the trust under which the Imperial Irrigation District owns the water rights for the common benefit. *Ivanhoe Irrigation District v. All Parties and Persons,* 53 Cal.2d 692, 712, 3 Cal.Rptr. 317, 329,

---

**39.** Three individuals filed notices of appropriation for the right to divert water for use in the Imperial Valley from the Colorado River between 1895 and 1899. Those notices were assigned to the California Development Company on the date they were recorded. The Imperial Irrigation District subsequently acquired all the assets of the California Development Company except for the latter's agricultural lands in Mexico.

350 P.2d 69, 81 (1960). Section 6 of the Boulder Canyon Project Act, therefore, does not preclude application of the excess lands provision of Section 46 of the Omnibus Adjustment Act of 1926.

█ The landowners next argue that the overall scheme of the Boulder Canyon Project Act is inconsistent with Section 46.[40] They point out that Section 46 combines a variety of provisions while the Project Act is composed of different sections dealing separately with different subjects. In itself, this hardly makes the two statutes incompatible. Section 4(b) of the Project Act, 43 U.S.C. § 617c(b), required the Secretary of the Interior to make provisions for reimbursement revenues before money was appropriated or construction began on the Canal, while Section 46 permits execution of a repayment contract upon completion of the project but before commencement of water deliveries. In this respect, the Project Act's modification of Section 46 deals only with the time for securing repayment and does not mean that all other substantive provisions of Section 46 are incompatible with the Project Act.[41]

The landowners point out that Sections 1 and 4(b) of the Project Act require reimbursement only for the capital costs of the "main canal and appurtenant structures to connect the Laguna Dam" while exempting users in the Imperial Valley from repayment obligations for the costs of water storage facilities. 43 U.S.C. §§ 617, 617c(b). Nevertheless, the Project Act still required reimbursement of substantial sums of money. This partial relaxation of Section 46's requirement of reimbursement of the capital costs of all project works does not make the other provisions of Section 46 inapplica-

ble. The landowners also note that Section 46 requires a contract while Section 4(b) of the Project Act requires the Secretary to insure repayment "by contract or otherwise." Whatever might be the case if the Secretary had "otherwise" insured repayment, the method chosen in the case of the Imperial Valley was a contract.[42]

█ The landowners further argue that Section 5 of the Project Act, 43 U.S.C. § 617d, prescribes conditions to govern water delivery contracts and that this Section requires the contracts to conform to Section 4(a) of the Project Act, 43 U.S.C. § 617c(a). They then argue that Section 4(a) contemplates the unconditional delivery of water to satisfy present perfected rights and says nothing about conforming to the reclamation laws. Sections 1 and 4(b) of the Project Act, they argue, contain references to reimbursement "as provided in reclamation law", but the landowners argue that these provisions are distinct from the provisions governing the delivery of water in Sections 4(a) and 5. They argue that it would be logical to place a condition that the delivery of water be subject to the reclamation laws in the section of the Project Act specifically governing such deliveries and that the failure to place such a condition in that section (and specifically placing such a condition in another section of the Project Act) means that there is no such condition on deliveries under Section 5.

This argument overlooks the fact Section 4(a) deals with interstate allocations of water and that conditions on the Secretary's authority under Section 5 are also contained in other sections of the Project Act. For example, Section 6, as previously urged by the landowners, is a significant

---

**40.** This argument would apply to all water deliveries through the All-American Canal, including delivery to the Coachella Valley. Cf. footnote 36, *supra.*

**41.** Similarly, we attach no significance in this context to the fact that Section 2(a) of the Project Act, 43 U.S.C. § 617a(a), establishes a special fund, the Colorado River Dam Fund, that is not envisioned by Section 46 and that is to receive all payments made for projects constructed pursuant to the Act.

**42.** The landowners fail to note that if the Secretary "otherwise" insures repayment, Section 4(b) still requires that it be done "in the manner provided in the reclamation law" and that at the time the contract was made there was no means authorized by the reclamation law, other than the type of contract involved here, for insuring repayment.

limitation upon the authority conferred by Section 5. Similarly, as discussed previously, Section 14 is also a significant limitation. The Section 4(a) limitation specifically incorporated into Section 5 is no stronger than the Section 6 limitation that is not specifically referred to in Section 5, and, as held earlier, the Section 6 limitation is not incompatible with the application of the excess lands provision of Section 46.

■ The landowners' next argue that Section 14 of the Project Act applies, by its terms, only to the "construction, operation, and management" of project works and not to the delivery of water. They claim that these terms refer only to the business and fiscal aspects of the project and not to matters of "social control" such as acreage limitations. They claim their argument is bolstered by the fact that the Project Act employs language in other sections that distinguishes between "construction, operation, and maintenance" and "delivery" of water.[43] This argument overlooks the fact that the contracts with irrigation districts required by Section 46 are themselves only for the reimbursement of the "cost of constructing, operating, and maintaining the works during the time they are in control of the United States" and that the Section 46 contracts with the irrigation districts are not for delivery of water. The requirement that excess lands shall not receive water is a condition, basic to achieving a central purpose of the reclamation laws, to be incorporated into a Section 46 contract with an irrigation district for "construction, operation, and maintenance" of a project. Under the Project Act, Imperial Valley landowners were only required to reimburse the United States for the "construction, operation, and management" expenses connected with the All-American Canal. They were not to be charged for any portion of the construction of Boulder Dam (the main storage dam) or for the use or delivery of the water. It was natural, therefore to have separate provisions dealing with the delivery of water, where no reimbursement was required, and with the construction of the Canal where reimbursement was required. With regard to the latter, as has previously been discussed, not only Section 14 but Sections 1 and 4(b) of the Project Act mandate application of Section 46 to reimbursement contracts. In this context, any differentiation in Project Act provisions for delivery of water and construction of the Canal is nothing more than a reflection of the fact that the Imperial Valley did not have to fully repay the United States for the benefits received under the Act but that repayment contracts for the benefits that did have to be reimbursed still had to be in accord with the reclamation law and Section 46.

■ The final statutory construction argument asserted by the landowners is based on Section 9 of the Project Act which provides for the disposition of public lands that could be practically irrigated and reclaimed by the project works authorized by the Act. 43 U.S.C. § 617h. This Section directed the Secretary to withdraw these public lands from entry and authorized re-opening them to entry at a later date. Lands subsequently opened for entry were to be in tracts in various sizes to be determined by the Secretary, with no tract larger than 160 acres. Section 9 also granted an exclusive entry preference to veterans for a period of three months, subject to the qualifications requirements of 43 U.S.C. § 433. The landowners argue that references in Section 9 to other statutes would not have been necessary if Section 14 of the Project Act generally incorporated the reclamation laws into the Act. They then argue that the specific references to other statutes in the Section of the Project Act dealing with public lands and the absence of any specific provisions dealing with excess private lands means that the excess lands provisions of

---

**43.** Compare Section 10, 43 U.S.C. § 617i, with Section 5, 43 U.S.C. § 617d, and Section 1, 43 U.S.C. § 617, with Section 4(b), 43 U.S.C. § 617c(b). See also Section 7, 43 U.S.C. § 617f. However, Section 8(b), 43 U.S.C. § 617g(b), appears to include delivery and use of water within the activities of construction, operation, and management. This argument would apply to all water deliveries through the All-American Canal. See footnotes 36, 40, *supra*.

Section 46 cannot apply to private lands benefiting from the Act.

The landowners are reading too much significance into Section 9's references to other statutes. The reference to a 160-acre limit on tracts of public land merely limits the Secretary of the Interior's discretion in determining tract sizes. Otherwise, Section 9 requires the opening of public lands for entry "in accordance with the provisions of the reclamation law"—a general reference to reclamation law similar to the general reference in Section 14. Similarly, the exclusive preference given to veterans by Section 9 has no counterpart in the general homestead laws, as incorporated into the reclamation law by 43 U.S.C. § 432,[44] so this preference had to be qualified by a specific reference to 43 U.S.C. § 433. To use these two minor qualifications by reference in Section 9 to create an exemption for private lands from the excess land laws in face of the strong national policy of generally enforcing those laws, the specific incorporation of reclamation law in Section 14 of the Act, and the lack of any specific exemption from the operation of the excess land laws in the Project Act puts a far too strained reading on Section 9 which cannot be accepted.

## V. Legislative History.

A series of bills introduced by Congressman Swing and Senator Johnson (both of California) in the 67th, 68th, 69th, and 70th Congresses, and known as the Swing-Johnson bills, culminated in the passage of the Project Act by the 70th Congress in December of 1928. The bills generated a great deal of controversy, especially because of the opposition of Arizona's Congressional delegation. However, despite hearings by committees of both the House and Senate considering each series of Swing-Johnson bills and extensive debates on the fourth and last Swing-Johnson measure that ultimately became the Project Act, the legislative history concerning the acreage limitation provisions of the reclamation laws is relatively meager. In reviewing this history, it is important to remember that the landowners seek to find in it a specific exemption that cannot be found in the actual language of the Project Act.

The relevant legislative history begins with the third series of Swing-Johnson bills introduced during the 69th Congress.[45] A bill introduced by Congressman Swing, H.R. 6251, was referred to the Department of the Interior, redrafted, and re-introduced as H.R. 9826. As redrafted, H.R. 9826 contained a provision identical to that eventually enacted as Section 14 of the Project Act.

During hearings on that bill, Congressman Swing informed a House committee that, in his opinion, the bill did not require a private landowner to sell lands in excess of 160 acres at prices to be fixed by the Secretary of the Interior. This statement was not made with reference to any particular portion of the bill. It was accompanied by Congressman Swing's misleading testimony that there were only one or two large landholdings in the Imperial Valley.[46] At the same time, the Commissioner of the Bureau of Reclamation told the committee that the bill permitted landowners to retain their farms intact no matter how large their holdings. However, he added that "old" lands, i. e., lands presently irrigated without the benefit of a federal reclamation project,

44. The time limit on preferences when the Project Act was passed was, in the discretion of the Secretary of the Interior, 90 days or more. See 42 Stat. 358 (January 21, 1922), later codified without relevant change as 43 U.S.C. § 186. Section 9 of the Project Act limits the preference period to exactly three months. (Except for lands in Alaska, the homestead laws were repealed effective October 21, 1976, by Public Law 94–579, Title VII, § 702, 90 Stat. 2787.)

45. The landowners rely on a brief exchange during committee hearings in 1924 on the second Swing-Johnson bill. However, this bill was never reported out of committee.

46. While the average size of an Imperial Valley farm in the 1920s may have been less than 160 acres, there were several over 320 acres. Taylor, *Water, Land, and Environment, etc.,* 13 Natural Resources Journal 1, 4 (1963).

would be sold water under a Warren contract.[47]

The Commissioner was referring to the Warren Act, 43 U.S.C. §§ 523–525.[48] Under that Act, water stored by a federal reclamation project in excess of the needs of that project could be delivered by contract to an irrigation district. However, that water could not be used "otherwise than as prescribed by law as to lands held in private ownership within Government reclamation projects." 43 U.S.C. § 523. Furthermore, the Warren Act, while not including a divestiture provision such as the one in Section 46, does provide that landowners cannot receive water in excess of an amount sufficient to irrigate 160 acres. 43 U.S.C. § 524.

The committee was thus being told by the government agency responsible for drafting H.R. 9826 that there was no applicable divestiture provision for excess lands but that the general language incorporating the reclamation law incorporated the Warren Act which did limit the amount of water a landowner could receive.[49] It is significant that these hearings were held in February and March of 1926 while Section 46 was not enacted into law until May of 1926.

After completion of the House hearings, the committee amended H.R. 9826 by adding a specific acreage limitation provision similar to the divestiture provision of Section 46. There is no contemporaneous explanation of the committee's reasons for adding this provision. However, in light of the view presented to the committee that the project to build the All-American Canal was viewed as a "supplemental" one subject only to the restrictions in the Warren Act, the amendment can most reasonably be construed as a decision to add an additional restriction to those already contained in the

Warren Act. The bill was reported favorably to the House, but it never came up for a vote.

Meanwhile, a bill sponsored by Senator Johnson, S. 3331, was favorably reported out of committee. Although the committee report did not specifically discuss the acreage limitation question, it did note that a provision in the bill essentially the same as what eventually became Section 14 of the Project Act, made the reclamation law applicable where not inconsistent with other portions of the statute. The report noted that "[i]n a great project as this many details may properly be referable to a general law such as the reclamation act."[50] During the Senate debates on the bill, Senator Johnson emphasized that the bill was to be part of the reclamation law.[51] Although made in the context of assuring Arizona's senators that Arizona's water rights would be protected, it could hardly have escaped the attention of the Senate that by that time the reclamation law also required significant acreage limitations in its provisions for contracts with irrigation districts. Shortly thereafter, Senator Phipps of Colorado introduced an amendment to S. 3331 and a new bill as a substitute to S. 3331. Both proposals included provisions specifically incorporating acreage limitation provisions similar to Section 46 into the bill's provisions for delivery of water. Neither Senator Phipps' proposals nor S. 3331 were ever the subject of a vote in the Senate.

During the 70th Congress, Congressman Swing and Senator Johnson renewed their efforts. A House bill, H.R. 5773, containing the specific acreage limitation provision previously added by the House committee to H.R. 9826 in the 69th Congress was passed and sent to the Senate. In the

---

47. Hearings on H.R. 6251 and H.R. 9826, 69th Cong., 1st Sess. (1926) at pps. 32–33. It should be noted that the Commissioner also testified that there were several large landholdings in the Imperial Valley.

48. Act of February 21, 1911, ch. 141, 36 Stat. 925.

49. Congressman Swing's testimony is not inconsistent with that of the Commissioner because the Congressman discussed only divestiture of excess acreage.

50. Senate Report No. 654, 69th Cong., 1st Sess. (1926) at p. 28.

51. 68 Cong.Rec. 4291–4292 (February 21, 1927).

meantime, a Senate bill, S. 728, sponsored by Senator Johnson, was being considered by the Senate. It contained a provision identical to Section 14 of the Project Act but did not contain the specific acreage limitation provision found in H.R. 5773. While the Senate version was ultimately adopted, the circumstances surrounding the decision to accept the Senate version do not give rise to a conclusion that the Project Act specifically exempts the Imperial Valley from the application of the acreage limitation provisions of the reclamation law.

Senator Johnson's proposal, S. 728, was considered in committee along with S. 1274, a bill proposed by Senator Phipps. The Phipps bill included an express requirement that acreage limitation provisions be incorporated in water delivery contracts while the Johnson bill contained only the general reference to reclamation law eventually enacted as Section 14 of the Project Act. The Johnson bill was reported to the Senate, but the committee did not report the Phipps bill. The Secretary of the Interior objected to the Phipps bill because of its failure to adequately provide for the development of hydroelectric power, and his objections were incorporated into the report on Senator Johnson's bill. In addition, the Secretary's opinion that the Johnson bill, containing no specific acreage limitation provision, was similar to H.R. 5773, which did contain such a specific provision, was also incorporated into the Senate report on the Johnson bill.[52]

When S. 728 reached the floor of the Senate, it was the subject of a lengthy filibuster. During the course of the debates, Senator Hayden of Arizona, one of the bill's most ardent opponents, claimed that the bill failed to provide acreage limitations on privately owned lands receiving

irrigation water as the House bill did and proposed an amendment that would contain a specific provision comparable to the one in the House bill.[53] This was one of many amendments sponsored by the two senators from Arizona. There was no discussion of the amendment and the Senate never voted on it. The first session of the 70th Congress adjourned in May of 1928 without the Senate ever voting on Senator Johnson's bill.

When the second session of the 70th Congress began in December of 1928, Senator Johnson immediately moved to substitute H.R. 5773, already passed by the House, for S. 728 and then amend H.R. 5773 by retaining only the enacting clause and substituting S. 728 for the body of the bill. Senator Johnson assured the Senate that he wished only to "preserve orderly legislative procedure" and that the two bills contained "like purposes" and "like designs."[54] The Senate unanimously consented to his request. Senator Hayden then made a speech and engaged in an extended colloquy with Senator Johnson and others over what Senator Hayden considered the significant differences between the bill passed by the House and the Senate version which had been substituted for the House bill. It is noteworthy that at this time Senator Hayden never mentioned the absence of a specific acreage limitation provision as being a significant difference between the Senate and House bills.[55]

During the entire debate in the Senate's second session extending from December 5, 1928, until the Senate passed the bill on December 14, 1928, the acreage limitation issue was mentioned only once. Senator Ashurst complained that the bill allowed irrigation water to be delivered to landhold-

---

52. Senate report No. 592, 70th Cong., 1st Sess. (1928) at pps. 30–31. Nevertheless, Senator Ashurst of Arizona attached a minority report that alleged, *inter alia,* that the committee had not included his proposed amendment to the bill that would have added a specific acreage limitation provision. *Id., Minority Views* at p. 26. This problem receives only two brief references in a minority report of some 38 pages.

53. 69 Cong.Rec. 7634–7635 (May 2, 1928). See also 69 Cong.Rec. 9451 (May 22, 1928).

54. 70 Cong.Rec. 67 (December 5, 1928).

55. 70 Cong.Rec. 71–81 (December 5, 1928).

ings in excess of 160 acres.[56] However, he made only a brief passing reference to the issue in a speech opposing the bill that extends over some 32 pages in the Congressional Record.[57] During the Senate debates in December of 1928, several amendments to the bill were brought up for a vote, but there were no votes on amendments that would have added more specific acreage limitation provisions to the bill.[58] Allocation of water from the Colorado River and control of hydroelectric power facilities were the predominant concerns of the bill's opponents. When the House considered the Senate bill and concurred in it on December 18, 1928, there was again no mention of the acreage limitation issue or the deletion of the specific acreage limitation by the Senate.

Evaluation of this legislative history does not lead us to conclude that Congress intended to exempt lands receiving water carried by the All-American Canal from the acreage limitations of Section 46. On the contrary, the legilsative history indicates that the problem did not receive the extended Congressional consideration that would be normally thought appropriate if an exemption to an important part of the reclamation law was being created. Furthermore, the legislative history can be interpreted as giving a positive indication that Congress intended that acreage limitation provisions be incorporated by the general references to reclamation law that were included in the Project Act. A specific acreage limitation was included in the bill

sent to the House during the 69th Congress after witnesses at the committee hearings claimed that, as originally drafted, there were no such provisions in the bill. During the 69th and 70th Congresses, the House passed a bill with a specific acreage limitation provision. During the 70th Congress, the Senate was told through a committee report and by the sponsor of the legislation that its bill was substantially the same as the bill passed by the House. There was no objection in the House when it considered the Senate bill with its general incorporation of reclamation law rather than the specific language previously used in the House version of the legislation. All this points to an interpretation opposite to that urged by the landowners.

 In support of their position, therefore, the landowners must rely on such evidence as the failure of the Senate committee to adopt Senator Ashurst's proposed amendment or Senator Phipps' proposed bill and the failure of the Senate to adopt Senator Hayden's proposed amendment. However, statutory interpretation cannot rest on unexplained actions of a Congressional committee.[59] Similarly, we cannot interpret a statute based on inferences the landowners seek to draw from proposed amendments to legislation that were never brought to a vote or even seriously debated on the floor. It could just as reasonably be inferred that the amendments were not adopted because the legislation was considered to have already incorporated the

56. 70 Cong.Rec. 289 (December 8, 1928).

57. 70 Cong.Rec. 277–298, 314–323 (December 8 and 10, 1928).

58. The landowners emphasize the origin of Sections 4 and 5 of the Project Act, claiming Congress chose to have Section 5 contracts for the delivery of water be governed by Section 4(a) rather than by a general reference to the reclamation law. In addition, they point out that an amendment to Section 4(b) proposed by Senator Pittman was modified because of Senator Johnson's objections. The modification eliminated requiring delivery of project water in accord with the reclamation laws. See 70 Cong.Rec. 526, 577 (December 13 and 14, 1928). However, the effect of the Pittman amendment was to require the All-American

Canal to be paid for under the terms of the reclamation law but without charging for the storage and delivery of the water. See 70 Cong.Rec. 576 (December 14, 1928). The end result was to adopt a provision similar to the proposal of Senator Ashurst cited on page 102 of the Landowners' Joint Consolidated Brief. In any event, as previously discussed, there is no incompatibility between Sections 4 and 5 of the Project Act and the application of Section 46.

59. To the extent that there is an explanation for any of these committee actions, it is that the Phipps bill was rejected as inadequate for reasons unrelated to the acreage limitation provision.

**536**

proposed changes. *United States v. Wise,* 370 U.S. 405, 411, 82 S.Ct. 1354, 8 L.Ed.2d 590 (1962). Cf.*National Automatic Laundry and Cleaning Council v. Shultz,* 143 U.S.App.D.C. 274, 443 F.2d 689, 706 (D.C. Cir.1971). The landowners also rely on statements of the bill's opponents. This type of evidence may be reliable when circumstances indicate the opponents' statements correctly indicate the views of the bill's proponents, *Arizona v. California, supra,* 373 U.S. at 583 n. 85, 83 S.Ct. 1468. However, in this case there is positive evidence that the bill's opponents were incorrect and their objections, at least on the part of Senator Hayden, were not maintained throughout the course of the debates. In view of all the circumstances reviewed above, we cannot rely on a few statements of opponents during the course of lengthy proceedings primarily concerned with other aspects of the proposed legislation as the correct version of the Project Act's legislative history. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 203 n. 24, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

The landowners seek to bolster their argument by claiming that Congress was not concerned with lands already irrigated by private efforts when it passed Section 46. They contend that Section 46 was designed only to prevent speculative profits made on unimproved arid lands that became part of a federal reclamation project. Since Congress was unconcerned with productive lands such as those in the Imperial Valley when Section 46 was passed, their argument goes, Congress was not violating any basic policy when shortly thereafter it exempted the Imperial Valley from the acreage limitations in Section 46. If this interpretation of Section 46 were correct, there would be less of a need to find a specific exemption for the Imperial Valley in the legislative history.[60]

 The landowners' interpretation of Section 46, however, is not correct. The statutory language makes acreage restrictions specifically applicable to all private lands receiving water through federal reclamation projects and makes no distinction between lands previously unproductive and lands previous productive because irrigated by non-federal projects. Congress was well aware when it passed Section 46 that many federal reclamation projects were initiated to supplement or replace non-federal irrigation projects, as was done in the Imperial Valley. Section 46 was designed to strengthen both the anti-speculative and anti-monopoly policies of the reclamation laws, and there is no question that Congress intended it to apply to previously irrigated and productive lands such as those in the Imperial Valley. *United States v. Tulare Lake Canal Co., supra,* 535 F.2d at 1112–1113, 1119, 1121 at n. 107, 1132.

> It is usually true that most of the land included in a reclamation project is privately owned; it is usually true that the private lands are already under irrigation through facilities developed at private expense; it is usually true that the reclamation project only supplements or regulates existing water supplies.

*Id.* at 1143.

VI. Administrative Practice.

The landowners next claim that the actual practice of the Department of the Interior supports their position. Relying on both a legal interpretation favorable to their position and the lack of Department enforcement of the excess lands provision of Section 46, they argue that this administrative practice is entitled to great, if not conclusive, weight in the statutory construction of the Project Act, has been ratified by Congress, and has been relied upon to such an extent that it cannot now be changed.

The legal interpretation upon which the landowners rely is a letter from Ray Lyman Wilbur, Secretary of the Interior, to the Imperial Irrigation District dated February 24, 1933.[61] It is important to examine this

---

**60.** The logical extension of this argument would in fact be that acreage limitations would not apply unless Congress specifically mandated such a result.

**61.** The letter is reprinted as Appendix E to Opinion M–36675, Applicability of the Excess Land Laws [to] Imperial Irrigation District

letter carefully before evaluating the landowners' claims.

The letter begins by referring to the then-pending suit of *Malan v. Imperial Irrigation District* and the allegation therein that, under the reclamation law, water cannot be delivered from the All-American Canal to any landowner owning more than 160 acres of land. Secretary Wilbur states that the allegation in the *Malan* litigation is an inaccurate statement of the reclamation law but that the allegation presumably refers to Section 5 of the Reclamation Act of 1902. The Wilbur letter asserts that Section 5 provides that no water shall be *sold* except under certain conditions but does not provide that no water shall be *delivered* from a canal constructed by the government and that the Project Act and the contract with the Imperial Irrigation District do not concern the sale of water and further provide that there will be no charge for the delivery of water.

This portion of the Wilbur letter, whether legally correct or not,[62] is irrelevant to the present case. It concerns only the applicability of Section 5 of the Reclamation Act of 1902. It does not purport in any way to consider Section 46 of the Omnibus Adjustment Act of 1926. The reasoning of this section of the Wilbur letter cannot apply to Section 46 because that statute does not speak in terms of the sale of water.

The next portion of the Wilbur letter states that the question of the application of the 160-acre limitation had been carefully reviewed and the conclusion had been reached that the limitation did not apply to lands "now cultivated and having a present water right."[63] This conclusion is then justified by the argument that Congress recognized that lands in the Imperial Valley had vested water rights when it provided that there be no charge for storage, use, or

delivery of water and that previous decisions of the Bureau of Reclamation had held that Section 5 of the Reclamation Act of 1902 did not prevent recognition of vested water rights for areas larger than 160 acres and that it permitted continued delivery of water to satisfy vested water rights in single ownerships larger than 160 acres.[64]

While this second argument is directed only at Section 5 of the Reclamation Act of 1902 and never mentions Section 46 of the Onmibus Adjustment Act of 1926, a variation of that argument with respect to Section 46 has been asserted as one of the landowners' main arguments, i. e., that the recognition of "present perfected rights" by the Project Act is incompatible with the application of the excess lands provision of Section 46. Significantly, however, the Wilbur letter makes no mention of the other landowners' assertions concerning the purported inconsistencies between the Project Act's reimbursement provisions and Section 46, the inapplicability of the excess lands provision of Section 46 because of the restricted incorporation of reclamation law by Section 14 of the Project Act, and the inapplicability of Section 46 by implication because of the public lands provisions of Section 9 of the Project Act. As to these arguments, the Wilbur letter, no matter how convincing or dubious its reasoning, can provide absolutely no support.

This letter cannot be given the weight the landowners seek. The letter was written after the Department of the Interior contracted with the Imperial Irrigation District. There is no evidence that the Department reached a conclusion before entering into the contract that the 160-acre limitation did not apply in the Imperial Valley. After a search by the Department, the only positive evidence that was uncovered on this question was that before the execution

Lands, 71 I.D. 496, 529 (1964) (hereinafter referred to as the Barry opinion.)

**62.** The landowners advance this argument to justify reversal of Judge Murray's decision in the residency case. Judge Murray had rejected such an argument. *Yellen v. Hickel, supra,* 352 F.Supp. at 1305–1306.

**63.** 71 I.D. at 530.

**64.** Intertwined with this argument is the assertion, previously discussed, that Section 5 of the Reclamation Act of 1902 cannot apply because no sale of water is involved.

of the contract the Department had actually taken the position that the excess land laws would apply in the Imperial Valley.[65] The Wilbur letter was in response to a request for a ruling by the Imperial Irrigation District, which hoped to receive a formal ruling that acreage limitations did not apply but did not want a formal ruling if the conclusion came out the other way.[66] No formal opinion on this issue was prepared by the Solicitor of the Department at that time.[67]

Doubts as to the legal validity of the Wilbur letter arose within the Department in 1944. The Coachella Valley in California also received water through the All-American Canal. The original contract with the water district in that Valley contained no specific provisions for enforcement of the excess land laws. During negotiations for a supplemental Coachella contract, the Bureau of Reclamation, believing that the acreage limitations applied, requested a formal ruling from the Solicitor.[68] The resulting opinion of Solicitor Fowler Harper, approved by the Secretary of the Interior in 1945, determined that the excess land provisions of the reclamation laws applied in the Coachella Valley and that nothing in the Boulder Canyon Project Act precluded their application to that Valley. The Harper opinion criticized the Wilbur letter as an informal decision designed to help the Imperial Irrigation District in the litigation then pending in state court concerning the validity of the District's contract. However, the Harper opinion did not directly overrule the Wilbur letter. Instead the Wilbur letter was distinguished on the basis that it applied only to the Imperial Valley and did not cover the Coachella Valley.[69]

After the Harper opinion was issued, the Veterans of Foreign Wars inquired in 1948 about the inconsistency of application of the 160-acre limitation in the Imperial and Coachella Valleys. The Secretary of the Interior at that time, Julius A. Krug, responded in a letter which did not attempt to legally justify or explain any inconsistencies between the Harper opinion and the Wilbur letter. Instead, Krug justified the non-application of the 160-acre limitation in the Imperial Valley on the ground that owners and subsequent purchasers of land in the Imperial Valley were entitled to rely upon the Wilbur letter and it would be unfair to change the situation even though the legal validity of the conclusions in the Wilbur letter might be questionable.[70]

In 1958, the question of the application of the 160-acre limitation in the Imperial Valley arose in proceedings before the special master appointed by the Supreme Court in the *Arizona v. California* litigation. The special master requested memoranda on the question and the Solicitor General then sought the views of the Solicitor of the Department of the Interior, Elmer F. Bennett. Solicitor Bennett's reply doubted that the acreage limitation question was relevant to the issues before the special master. Bennett's reply also came to essentially the same conclusion reached by Secretary Krug in 1948. Without undertaking any legal analysis of the issue, he concluded that water had been delivered pursuant to the contract since the early 1940s, that no legal challenge to the contract had been raised

65. 71 I.D. at 509 n. 25.

66. *Id.*

67. After the Wilbur letter was issued, representatives of the Imperial Irrigation District expressed concern that the letter did not discuss the applicability of Section 46 of the Omnibus Adjustment Act of 1926. A letter from Porter W. Dent, Assistant Commissioner and Chief Counsel of the Bureau of Reclamation, to the Bureau's Regional Counsel in Los Angeles, dated March 1, 1933, took the position that the same principle discussed in the Wilbur letter with respect to Section 5 of the Reclamation Act of 1902 applied to Section 46. See Appendix F to the Barry opinion, 71 I.D. at 531–532. There is no claim that this letter should be considered as an administrative construction of the Project Act to which the courts should defer.

68. 71 I.D. at 514.

69. Solicitor's Opinion, M-33902 (May 31, 1945), found as Appendix H to the Barry opinion, 71 I.D. at 533–548.

70. 71 I.D. at 515.

since the state court confirmation proceedings, that no administrative action had ever been taken to enforce the acreage limitation, and that it was no longer realistic and practicable to enforce that law even if it should have been enforced. The Solicitor General then filed a memorandum with the special master taking the position that non-compliance with the acreage limitations was not relevant to the issues before the special master. In a footnote, however, the Solicitor General's memorandum concluded that the acreage limitations of the reclamation laws applied to privately owned lands in the Imperial Valley receiving water from the All-American Canal.[71]

The only legal analysis of the Department of the Interior, therefore, which supports the landowners' interpretation of the Project Act is the Wilbur letter of 1933. That letter does not purport to deal with the questions of interpretation raised in this case. The Department of the Interior itself began to have doubts about the legal soundness of the Wilbur letter's conclusions shortly after water deliveries through the All-American Canal began in the early 1940s but continued to adhere to the practice of nonenforcement of acreage limitations in the Imperial Valley because of its previous practice of nonenforcement. Finally, the legal validity of the conclusions in the Wilbur letter were specifically rejected by the Department of the Interior in 1964.

A thorough and comprehensive opinion by Solicitor Frank J. Barry was prepared in response to Congressional inquiries in 1961 and 1964.[72] The opinion specifically rejected the legal basis set forth in the Wilbur letter for concluding that Section 5 of the Reclamation Act of 1902 still permitted deliveries of water to excess lands that had vested water rights prior to the initiation of the reclamation project. The precedents cited in the Wilbur letter were actually special cases where the government acquired existing physical irrigation facilities for incorporation into a reclamation project and were not applicable in the Imperial

Valley. The Barry opinion considered the language of the Project Act, its legislative history, the Wilbur letter and previous administrative practices and concluded that privately owned lands in the Imperial Irrigation District are subject to the excess land laws.

■ The landowners seek to elevate the legal conclusions reached in the Wilbur letter into the binding force of law. Without setting forth the facts in each of the cases upon which they rely, it suffices to say that such a proposition is far too broad. The appropriate deference to be accorded an administrative construction of a statute is that a "consistent and longstanding" interpretation of a Congressional enactment by an agency charged with administration of that statute is entitled to "considerable weight" but it does not control the decisions of the courts. *United States v. National Association of Securities Dealers,* 422 U.S. 694, 719, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975). The ultimate responsibility of interpreting the language of Congress resides in the courts. *Zuber v. Allen,* 396 U.S. 168, 193, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969).

■ In the case of the Wilbur letter, there is an informal opinion reached under circumstances indicating a lack of careful consideration. It does not purport to even consider the portion of the reclamation law in question in this case. The legal conclusions of the Wilbur letter have not been consistently held to be correct by the Department of the Interior. Most if not all of its reasoning was implicitly rejected in the Harper opinion of 1945 and it was explicitly rejected in the Barry opinion of 1964. The Wilbur letter does not construe ambiguous or doubtful language in the Project Act but in a rather simplistic analysis not contained in a formal opinion purports to find an inconsistency between two different statutes. It is an interpretation made after enactment of both statutes and consequently never before Congress when the Project Act was being considered. In these circum-

---

71. 71 I.D. at 515–516.

72. The Barry opinion, fn. 61, *supra.*

stances, insofar as the application of the excess lands provision of Section 46 of the Omnibus Adjustment Act of 1926 is concerned, the Wilbur letter is not entitled to any deference as a proper construction of the Project Act and reclamation law. Cf. *General Electric Co. v. Gilbert,* 429 U.S. 125, 141–142, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976); *Shea v. Vialpando,* 416 U.S. 251, 262 n. 11, 94 S.Ct. 1746, 40 L.Ed.2d 120 (1974); *Zuber v. Allen, supra,* 396 U.S. at 192–193, 90 S.Ct. 314; *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 41 n. 27, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977).

 It is true that, in practice, the Department of the Interior did not enforce the 160-acre limitation on lands in the Imperial Irrigation District. This inaction was based at first upon the Wilbur letter which was itself an informal opinion that is legally incorrect and that does not even deal with the reclamation statute at issue in this case. Sometime thereafter, the Department of the Interior abandoned justifying its inaction on the analysis contained in the Wilbur letter but instead decided against nonenforcement of the 160-acre limitation because it had not been enforced before. Inaction based on previous inaction cannot be elevated into an administrative determination to which the courts should defer.[73]

 The landowners contend that the "consistent" administrative interpretation that the 160-acre limitation did not apply to private lands in the Imperial Valley was brought to the attention of Congress and that Congressional failure to object amounts to a Congressional ratification of the Wilbur interpretation of the Project Act. Such a sweeping claim fails to stand up in light of an analysis of what can actually be considered to have been brought to the attention of Congress and the manner in which this occurred.

Many of the references in committee hearings upon which the landowners rely are brief references to the situation in the Imperial Valley contained in lengthy considerations of completely different reclamation projects such as the San Luis or Central Valley Projects. The claim of an exemption from application of the acreage limitations to private lands in the Imperial Valley was often raised by advocates of exemptions in allegedly similar situations in attempts to persuade Congress to specifically place such an exemption in another reclamation project. Rejection, or even acceptance, of an exemption claim for another project hardly amounts to deliberate Congressional consideration of the situation in the Imperial Valley. The same holds true for brief references to the Imperial Valley in government reports sent to various Congressional committees.

The best evidence the landowners can muster on this argument concerns the 1958 hearings before the Subcommittee on Irrigation and Reclamation of the Senate Committee on Interior and Insular Affairs reviewing the acreage limitation provisions in the reclamation law.[74] The subcommittee was concerned with the future shape of the reclamation law in general and the application of acreage limitation provisions to a small number of new projects in particular. It was not concerned with legislation for the Imperial Valley. The situation in the Imperial Valley and the Wilbur letter were brought to the subcommittee's attention. Counsel for the Imperial Irrigation District testified shortly after appearing before the Supreme Court in the *Ivanhoe Irrigation District v. McCracken* litigation. His testimony echoed the theory concerning vested water rights that was enunciated by the California Supreme Court in that series of cases and was later rejected by the Supreme Court. These circumstances cannot amount to Congressional ratification by si-

---

**73.** Administrative practice plainly contrary to the law may be overturned no matter how long standing. *Baltimore & Ohio R. Co. v. Jackson,* 353 U.S. 325, 77 S.Ct. 842, 1 L.Ed.2d 862 (1957); *United States v. E. I. duPont de Nemours & Co.,* 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957).

**74.** *Acreage Limitation (Reclamation Law) Review: Hearings on S. 1425, S. 2541, and S. 3448,* Subcommittee on Irrigation and Reclamation of the Senate Committee on Interior and Insular Affairs, 85th Cong., 2d Sess. (1958).

lence of the Wilbur interpretation. Significantly, the chairman of the subcommittee, Senator Anderson, was the Senator who later initiated the Department of the Interior review that culminated in the Barry opinion rejecting the Wilbur interpretation.

The landowners seek to draw favorable implications from the fact that Congress took no action with respect to private lands in the Imperial Valley when in 1946 it amended Section 9 of the Project Act dealing with public lands and when it rejected an attempt by the Bureau of Reclamation to extend its control over operation of the project works. However, there is no evidence that the acreage limitation question was brought to the attention of Congress during its consideration of these other matters. For example, the 1946 amendment to Section 9 of the Project Act merely extended the veterans' preference in that Section to veterans of World War II and to those who had served in the Coast Guard.[75] Furthermore, in contrast with the Imperial Irrigation District's dispute with the Bureau of Reclamation that the landowners refer to, Congress took no action when the present dispute over application of the acreage limitations arose after the 1964 Barry opinion, so it could be argued, in terms of the landowners' frame of analysis, that Congress acquiesced in this new interpretation of the reclamation laws. We draw neither conclusion from Congressional inactivity. The point is that in the absence of specific indications that Congress actually considered this problem, the incidents relied upon by the landowners cannot support the finding of Congressional ratification that the landowners desire.

This conclusion is buttressed by consideration of the landowners final version of this argument, i. e., that with all this information on the situation in the Imperial Valley, the repeated appropriations from 1936 to 1950 for continuing construction on the All-American Canal amounts to a Congressional ratification of the administrative construction as it is viewed by the landowners. However, the references relied upon by the

landowners to show Congressional knowledge and consideration of the Wilbur letter do not date back earlier than 1944. There is no showing of Congressional knowledge and consideration, one way or the other, prior to that year. In addition, in 1944 the Harper opinion cast considerable doubt over the validity of the Wilbur interpretation even if it did not specifically reject it in the case of the Imperial Valley, and Congress may have been aware of the later Department of the Interior opinion. Furthermore, by 1944 the Imperial Valley had already been receiving all of its irrigation water through the All-American Canal for about two years. Presented with this situation and the Harper opinion, the following appropriations may just as well be considered solely as Congressional ratification of the application of acreage limitations in the Coachella Valley. As before, the record here is too sparse and ambiguous to justify a conclusion that Congress approved of the Wilbur construction of the Project Act and the reclamation laws.

The landowners claim that it would be unfair to enforce the excess lands provision of Section 46 of the Omnibus Adjustment Act of 1926 because of individual landowner reliance on the Wilbur letter and the past non-enforcement of the 160-acre limitation. The landowners raise claims here based on broad generalizations that cannot apply under the facts of the case. There are many holdings of land in excess of the 160-acre limitation in the Imperial Irrigation District before the Wilbur letter was issued and these holdings could not have been acquired in reliance upon the assurances contained in that letter. In any event, the questions of reliance and estoppel presented by the landowners' argument here are not germane to this lawsuit. In operation, Section 46 requires compensation to excess land holders for the value of their property and their improvements to their property. It only excludes the increase in the value of the land attributable to the federal project. *United States v. Tulare Lake Canal Co., supra*, 535 F.2d at 1113 n.

---

**75.** See 1946 U.S.Code Congressional Service pp. 1080–1081.

74, 1144.[76] Furthermore, assuming that any individual landowner can make out a claim to greater compensation based on estoppel or some other theory, compensation will be available, for if the enforcement of the conditions of Section 46 "impairs any compensable property rights, then recourse for just compensation is open in the courts." *Ivanhoe Irrigation District v. McCracken, supra,* 357 U.S. at 291, 78 S.Ct. at 1183. Cf. *United States v. Union Oil Company of California,* 549 F.2d 1271, 1281 (9th Cir. 1977). The point is that the possibility that such compensation may be mandated cannot defeat compliance with the conditions of the reclamation laws.

■ In a variation on the reliance on administrative practice argument, the District relies on its contract with the United States. Article 30 of the contract paraphrases Section 14 of the Project Act. The Coachella Valley contract contains an identical section but, in addition, contains additional clauses dealing with the divestiture of excess lands. The District argues that

these additional clauses would be superfluous if the section based on Section 14 of the Project Act was sufficient to incorporate Section 46. However, it should be remembered that after the Barry opinion was issued in 1964 the District refused to agree to a supplemental contract with the United States that would govern the administration of the divestiture provisions of Section 46. From the discussion in Part IV, *supra,* it is clear that the general incorporation of the reclamation law in Section 14 of the Project Act that is carried over into the contract is sufficient to mandate application of Section 46.[77]

VII. Conclusion.

In No. 71–2124, the district court's order denying leave to intervene is reversed, the protective notice of appeal is validated, and the judgment is reversed. In Nos. 73–1333 and 73–1388, the judgment is vacated and the case is remanded with instructions to dismiss the complaint because of lack of standing.

Appendix to follow

---

**76.** The District claims that the construction of the All-American Canal did not change the value of private lands in the District because the Canal only provided an alternate means of conveying irrigation water already supplied by non-federal enterprise. We doubt that this is the case. The location of the Canal entirely within American territory, a project the District was unable to undertake on its own, is, in itself, a significant benefit. The appraisal process takes into account the value, or lack thereof, of the federal project to the private lands.

However, Section 46 would still apply because it was the intent of Congress to make small family farms the recipients of water delivered by federal reclamation projects.

**77.** For the reasons set out in Part IV of this opinion, the District's argument that separation of the contract provisions for delivery of water and for construction, operation, and maintenance of the Canal precludes application of Section 46 must also be rejected.

APPENDIX

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

 *Appellee,*

 VS.

IMPERIAL IRRIGATION DISTRICT, a corporation,

 *Appellee,*

JOHN M. BRYANT, et al.,

 *Appellees,*

STATE OF CALIFORNIA,

 *Appellee.*

BEN YELLEN, et al.,

 *Appellants.*

No. 71–2124

---

[August 6, 1973]

---

Before: HASTIE,* MERRILL and ELY, Circuit Judges.

### ORDER ALLOWING INTERVENTION

It appearing that the decision of the district court in this case, 322 F.Supp. 11 (S.D.Cal.1971) and a subsequent decision of another judge of the same court in *Yellen v. Hickel,* 335 F.Supp. 201 (S.D.Cal.1972) disclose conflicting rulings on questions of law that may significantly affect the course of economic development of the Imperial Valley of California; and it also appearing that an appeal to this court in *Yellen v. Hickel* is pending at our Nos. 73–1333 and 73–1388, but that the election of the United States, the unsuccessful plaintiff, not to take an appeal in the present case precludes appellate review unless the interested Imperial Valley landowners who are before us seeking to intervene are allowed to do so and to perfect and prosecute a protective appeal that they have noticed; and it further appearing that the order of the district court denying intervention, from which the interested landowners are now appealing, was made before the district court decision in *Yellen v. Hickel* and, therefore, that the district court could not anticipate the decisional conflict in the light of which this court now must act; and because it is the responsibility of this court to avoid, where feasible, the confusion and uncertainty that would result if two conflicting final decisions on legal issues of public and private importance should both be in force in this circuit.

Now, therefore, it is ORDERED that the order of the district court denying the petition of the appellants to intervene in this cause is reversed, and intervention as prayed is allowed nunc pro tunc and the protective appeal noticed by the intervenors is validated.

---

* Honorable William H. Hastie, Senior United States Circuit Judge, Third Circuit, sitting by designation.

544

It is further ORDERED that the Clerk shall in due course calendar this appeal and the appeal in *Yellen v. Hickel* for hearing on the same day before the same panel of this court.

The parties to this appeal shall be privileged to supplement their briefs and the record heretofore filed herein.